# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID W. CASE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-08-0835 |
| | § | |
| OMEGA NATCHIQ, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM AND OPINION

This case arises out of an injury that David W. Case sustained while on board the Rowan Midland, an offshore structure moored in the Gulf of Mexico.  Case sued his employer, Omega Natchiq, Inc. ("Omega"), and the Rowan Midland's then-owners, Rowandrill, Inc. and the Rowan Companies, Inc. (together, "Rowan"), and the charterer and subsequent owner, ATP Oil & Gas Corporation ("ATP").  Case asserted Jones Act claims for negligence against Omega and ATP and for unseaworthiness against Rowan and ATP.  Case sued in state court.  The defendants timely removed on the basis of federal-question jurisdiction under the Outercontinental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333 *et seq.*  (Docket Entry No. 1).  Case has moved to remand on the basis that he properly pleaded a Jones Act cause of action, making the case nonremovable.  (Docket Entry No. 13).  The defendants have responded by arguing that as a matter of law, Case is not a seaman and that federal removal jurisdiction is proper.  (Docket Entry No. 15).

Based on a careful review of the remand motion and response, the record, and the applicable law, this court denies Case's motion to remand. The reasons are explained below.

## I.    Removal

A plaintiff may bring a Jones Act suit in federal or state court. A suit filed in state court is not removable because the Jones Act incorporates provisions of the Federal Employers' Liability Act, including 28 U.S.C. § 1445(a), which bars removal. *See Lackey v. Atl. Richfield Co.*, 990 F.2d 202, 207 (5th Cir. 1993); *see, e.g.*, *Lirette v. N.L. Sperry Sun, Inc.*, 820 F.2d 116, 117 (5th Cir. 1987) (en banc). But if a suit joins a Jones Act claim with a separate and independent claim that is within federal-question jurisdiction, removal may be permitted. *See Hopkins v. Dolphin Titan Int'l, Inc.*, 976 F.2d 924, 926 (5th Cir. 1992).

An improperly pleaded Jones Act claim does not bar removal. *See Fields v. Pool Offshore, Inc*., 182 F.3d 353, 356 (5th Cir. 1999). In general, a court is limited to the plaintiff's pleadings in determining whether a Jones Act claim is properly asserted. *See Addison v. Gulf Coast Contracting Servs., Inc.*, 744 F.2d 494, 498 n.3 (5th Cir. 1984); *Lackey*, 990 F.2d at 206. This limitation only exists in the absence "of any issue of a fraudulent attempt to evade removal." *Preston v. Grant Adver., Inc.*, 375 F.2d 439, 440 (5th Cir. 1967). If a defendant can show that the Jones Act claims are improperly pleaded to avoid federal jurisdiction, the suit is subject to removal. *See Burchett v. Cargill*, 48 F.3d 173, 175–76 (5th Cir.1995). The fact that Jones Act claims are not ordinarily removable does not preclude examination into whether a Jones Act claim is proper. A defendant may "pierce the pleadings to show that the Jones Act claim has been fraudulently pleaded to prevent

2

removal." *Lackey*, 990 F.2d at 207. The district court may examine affidavits and other material, but the court's review should not amount to an evidentiary hearing. *See Burden v. Gen. Dynamics Corp.*, 60 F.3d 213, 217 (5th Cir. 1995). Remand should be denied if the court determines, after resolving "all disputed questions of fact and any ambiguities in the current controlling substantive law in plaintiff's favor," that there is no reasonable basis on which the plaintiff may establish liability under the Jones Act. *Fields*, 182 F.3d at 356 (quoting *Burchett,* 48 F.3d at 175).

Even if there is no Jones Act claim precluding removal, there must be a basis for federal removal jurisdiction. The defendants rely on federal-question jurisdiction under the OCSLA, 43 U.S.C. §§ 1333, 1349(b)(1), despite the fact that Case did not assert a claim under, or refer to, this statute in his complaint. Under the Fifth Circuit authorities, in determining whether a claim arises under the OCSLA, the court looks to whether the plaintiff's employment furthered mineral development on the Outer Continental Shelf and whether the plaintiff's injury would not have occurred but for his employment. *See Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

Generally, a defendant has the right to remove a case to federal court when federal jurisdiction exists and the removal procedure is properly followed. 28 U.S.C § 1441. The removing party bears the burden of establishing that a state court suit is properly removable to federal court. *See Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 365 (5th Cir.1995). Doubts about the propriety of removal are to be resolved in favor of remand. *See Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir. 2000).

3

## II.     Background

The defendants have submitted affidavits in support of their removal.  The affidavits include one from Mickey Shaw, Vice-President of Production of ATP Oil & Gas Corporation, and one from Gary Buchanan, President of Omega.  (Docket Entry No. 15, Att. 1 and 2).  The affidavits and record show that ATP chartered, then purchased, the Rowan Midland from Rowandrill.  When ATP chartered the Rowan Midland in October 2005, it was a semisubmersible offshore drilling rig.  ATP, which owns mineral interests in the Gulf of Mexico, including in the Mississippi Canyon, acquired the Rowan Midland to convert it to a floating production facility to process hydrocarbons produced from ATP's wells in the Mississippi Canyon.  When ATP chartered the Rowan Midland, it was being modified for conversion from a "mobile offshore drilling unit" to a "floating offshore installation."  ATP hired Bluewater Industries to serve as the primary contractor for the conversion.  Bluewater Industries and Omega had a master service agreement under which Omega provided labor and materials on a time and materials basis.  (*Id.*, Att. 2 at 2).  Omega provided labor and materials to fabricate process modules to be installed on the Rowan Midland.  That work was performed at Omega's construction facility in New Iberia, Louisiana.  Omega's primary business is to provide construction services to companies working in the oil and gas industry.  (*Id.*, Att. 2 at 1).

The process modules were transferred from Louisiana to a dock in Texas and installed onto the Rowan Midland.  (Docket Entry No. 15, Att. 1 at 2).  The conversion of the Rowan Midland was completed on land between September 2005 and January 2006.  In January

4

2006, the converted platform was towed out to the Mississippi Canyon and moored to the seabed of the Outer Continental Shelf by a pre-installed 12-point taut-leg mooring system fixed to the seabed by suction embedded plate anchors. (*Id.*, Att. 1 at 3). Final rigging was completed, including connecting the Rowan Midland to ATP's subsea wells. (*Id.*, Att. 1 at 3). The first production through the Rowan Midland began on March 9, 2006. (*Id.*, Att. 1 at 3).

Bluewater Industries hired Omega to provide construction labor to assist in the final installation of the production facility at the Mississippi Canyon site. (*Id.*, Att. 2 at 2). Bluewater Industries also hired Omega to provide maintenance and construction personnel for work aboard the Rowan Midland in May and October 2006. (*Id.*, Att. 2. at 3).

ATP became the owner of the Rowan Midland in January 2007 and changed its name to the ATP Innovator. According to ATP, the ATP Innovator will remain in place "as long as there are hydrocarbons available to be economically produced from ATP's MC 711 field, or so long as there is other third party production in the area to be processed." (Docket Entry No. 15, Att. 1. at 3).

ATP's Vice-President stated in his affidavit that Omega was not hired to provide crew members for the Rowan Midland. Instead, Omega personnel were only on board the Rowan Midland to perform construction and maintenance work on a "temporary basis." (Docket Entry No. 15, Att. 1 at 4). The President of Omega similarly testified that "Omega did not have and has never had any personnel permanently attached to the service of the Midland Rowan." (*Id.*, Att. 2 at 2–3).

5

Omega hired Case on February 3, 2006.  Before working for Omega, Case had worked almost exclusively onshore.  (Docket Entry No. 15, Att. 3).  Case began work at Omega on February 20, 2006, when he was assigned to work with the Omega construction crew on board the Rowan Midland.  (Docket Entry No. 15, Att. 2 at 2).  He was assigned a bunk in the sleeping quarters, which had three tiers of bunks.  According to Case's complaint, he was assigned a bunk on the third level.  (Docket Entry No. 1, Att. 3 at 4–5).  Case objected to this assignment because he moved around at night and was afraid he would fall off, but was told that the bunk was the only one available.  (*Id.* at 5).  Although the bunks had railings, the bunk mattresses were higher than the bed railings.  (*Id.* at 5).  In the middle of the night, Case fell from his third-tier bunk and "shattered" the radius bone in his right arm.  (*Id.* at 5).

Case was returned to shore that day.  He remained an Omega employee until December 17, 2006 and finished his last work on November 15, 2006.  He worked as a rigger except for 80 hours spent working as a truck driver.  Case was employed a total of 1,803 hours, included 44 hours of holiday time.  (Docket Entry No. 15, Att. 3 at 3).  His work on the Rowan Midland amounted to 185 hours, approximately 10.52% of the total work hours for which Case was paid during his employment with Omega.  (*Id.*, Att.3 at 4).  The rest of the time, Case worked at Omega's yard in New Iberia as a driver or as a rigger aboard fixed platforms.  (*Id.*, Att. 3 at 4).

In his complaint, Case alleges that he is a Jones Act seaman, that the Rowan Midland is a "vessel" within the meaning of the Act, and that his connection to the Rowan Midland was substantial in duration and nature.  Case alleges that Omega and ATP were negligent in

6

failing to provide suitable sleeping quarters such that no employee would have to sleep on a third-tier bunk without a railing.  He also alleges that ATP and Rowan are liable as vessel owners for its unseaworthiness.

In their notice of removal, the defendants asserted that Case is not a Jones Act seaman and that this court has subject-matter jurisdiction over the claim under the OCSLA.  Case filed a timely motion to remand, arguing that Jones Act suits may not be removed from state court; that he properly alleged a cause of action under the Jones Act because he is a seaman; and that because he pleaded no OCSLA claim, it cannot provide a basis for removal.  In their joint opposition to Case's motion to remand, the defendants assert that he Case not a seaman within the Jones Act, that his complaint was improperly pleaded under the Act, and that the suit falls within the OCSLA's federal subject-matter jurisdiction.  The defendants contend that Case lacked "substantial connection" to a "vessel in navigation" because he had no substantial connection in time or work to the Rowan Midland and because it was not a vessel "in navigation" but rather undergoing construction for conversion to a floating production facility when Case was injured.  (Docket Entry No. 1 at 6).

The critical issue is whether, based on the parties' pleadings and affidavits, Case is a Jones Act seaman.

### III.     Seaman Status under the Jones Act

Case's Jones Act claims for negligence and unseaworthiness require that he qualify

as a Jones Act seaman.  For a plaintiff to recover damages under the Jones Act, he must be

a seaman under that Act.  46 U.S.C. § 688.  The Act provides a negligence cause of action

for a "seaman" injured in the course of his employment but does not define "seaman."  *See*

*McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991).  The question of who is a

seaman under the Jones Act is a mixed question of fact and law based on the totality of the

circumstances.  *Id.* at 338.

The Supreme Court has stated that Congress intended the term "seaman" under the

Jones Act to have the meaning established under general maritime law at the time of the

Act's passage.  *McDermott*, 498 U.S. at 341.  In *Chandris, Inc. v. Latsis*, 515 U.S. 347

(1995), the Supreme Court identified a two-part analysis to determine whether an employee

qualifies as a Jones Act seaman.  The employee's duties must contribute to the function of

the vessel or the accomplishment of the vessel's mission, and the employee must have a

connection to the vessel in navigation that is substantial in both duration and nature.  *See*

*Chandris*, 515 U.S. at 350.  An employee does not have to aid in the navigation or

transportation of the vessel.  *See McDermott*,  498 U.S. at 338.  The two prongs of the

*Chandris* test for seaman status are examined below.

### A.      Was Case Working on a Vessel in Navigation?

A claim under the Jones Act must concern a "vessel in navigation." *See McDermott*, 498 U.S. at 354; *Holmes v. Atl. Sounding Co.*, 437 F.3d 441, 446 (5th Cir. 2006); *Ellender v. Kiva Constr. & Eng'g, Inc.*, 909 F.2d 803, 805 (5th Cir.1990).  "The existence of a vessel is a 'fundamental prerequisite to Jones Act jurisdiction' and is at the core of the test for seaman status." *See Daniel v. Ergon*, 892 F.2d 403, 407 (5th Cir. 1990) (quoting *Bernard v. Binnings Constr. Co.*, 741 F.2d 824, 828 (5th Cir. 1984)).  The parties dispute whether the Rowan Midland was a vessel in navigation.

When Case was injured, the Rowan Midland was a mobile offshore drilling rig in the process of final conversion to a semisubmersible floating production facility.  (Docket Entry No. 15 at 3).  In September 2005, the conversion of the Rowan Midland began with the removal of the derrick and associated drilling equipment and the installation of production modules that Omega constructed.  (*Id.* at 3–4).  In January 2006, the Rowan Midland was towed to the Mississippi Canyon where it was moored to the seabed.  (*Id.* at 4).  The Rowan Midland was undergoing final outfitting when Case was injured on his first night on board, February 20, 2006.  (*Id.*).  First production from the field did not occur until March 9, 2006. (*Id.*).

In determining whether a special-purpose structure – such as a mobile offshore rig or a floating production unit – qualifies as a vessel in navigation, a court looks at the purpose for which the structure was constructed and the business in which it is engaged.  *See*

*Bernard*, 741 F.2d at 829; *Barrios v. Engine & Gas Compressor Servs., Inc.*, 669 F.2d 350, 353 (5th Cir. 1982); *Blanchard v. Engine & Gas Compressor Servs.*, 575 F.2d 1140, 1142 (5th Cir.1978); *Cook v. Belden Concrete Prods., Inc.*, 472 F.2d 999, 1001 (5th Cir. 1973). Neither size, ability to float, permanence of fixation to shore or bottom, nor the fact of movement or capability of movement across navigable waters is dispositive in determining whether a structure is a "vessel." *See Bernard*, 741 F.2d at 829. "Strange-looking, special purpose craft for the oil and gas business, far different from traditional seafaring ships, have sometimes met these criteria [and qualified as vessels in navigation]." *See Blanchard*, 575 F.2d at 1142.

A structure that is a vessel is considered to be "in navigation" once it is "engaged in an instrument of commerce and transportation on navigable waters." *Williams v. Avondale Shipyards, Inc.*, 452 F.2d 955, 958 (5th Cir.1971). The owner of a vessel under construction that is incomplete and not yet used for its intended purpose does not owe a warranty of seaworthiness. *See Hollister v. Luke Constr. Co.*, 517 F.2d 920, 921 (5th Cir. 1975).

The Fifth Circuit has identified three main factors in examining whether an unconventional craft can be considered a "vessel": (1) whether the structure was constructed and used primarily as a work platform; (2) whether the structure was moored or otherwise secured at the time of the accident; and (3) whether, although the structure was capable of movement and sometimes moved across navigable waters in the course of normal operations, any transportation was merely incidental to the primary purpose of serving as a work

platform. *See Bernard*, 741 F.2d at 831. If a work platform meets these three factors, it cannot avoid the usual classification as "not a vessel" under the Jones Act. *Id.* In *Hemba v. Freeport McMoran Energy Partners, Ltd.*, the Fifth Circuit supplied additional factors to consider: the owner's intent to move the structure on a regular basis; the ability of the submerged structure to be refloated despite years of corrosion and deterioration; and the time the structure remained stationary. *See Hemba*, 811 F.2d 276, 277–78 (5th Cir.1987).

Courts have long recognized the difference between "work platforms" designed to be primarily stationary and "vessels" designed for navigation. *See Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625, 627–28 (1887) (floating dry dock is not a vessel). Courts have held that floating production platforms are outside the Jones Act meaning of "vessel." *See Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290, 293–94 (5th Cir. 1990) (finding that quarterboat barge shares "sufficient traits with the family of fixed platforms and floating work barges previously" deemed nonvessels under Jones Act); *see also Burchett*, 48 F.3d at 177–78 (holding that structure's movement was merely incidental and not a characteristic of a "vessel"); *Cook*, 472 F.2d at 1000–01 (finding platform legally indistinguishable from a floating dry dock due to its purpose and business, despite its potential mobility); *but see Ducote v. V. Keeler & Co., Inc.*, 953 F.2d 1000, 1004 (5th Cir. 1992) (finding that despite barge's use as a work platform, its planned movement was sufficient for a reasonable jury to find more than incidental).

In contrast to production platforms, semisubmersible drilling rigs are generally considered vessels under the Jones Act. *See Dominigue v. Ocean Drilling and Exploration Co.*, 923 F.2d 393, 394 n.1 (5th Cir. 1991); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 n.5 (5th Cir. 1986) (finding such a rig to be "indisputably a vessel"). Unlike work platforms, submersible drilling rigs are moved on a regular basis, which distinguishes them from work platforms and qualifies them as vessels in navigation. *See Colomb v. Texaco, Inc.*, 736 F.2d 218, 221 (5th Cir. 1984); *Blanchard*, 575 F.2d at 1143. Rigs and other drilling structures that are intended to be moved frequently are classified as vessels. *See Manuel v. P.A.W. Drilling & Well Serv., Inc.*, 135 F.3d 344, 351–52 (5th Cir. 1998) (holding that drilling craft was a vessel because it was a "highly mobile unit" deployed to nineteen different sites over two years); *Colomb*, 736 F.2d at 221 (finding that submersible drilling barge was "highly mobile" due to routine relocation).

If a structure has yet to be completed or is undergoing conversion so that it has not yet been used for its intended business purpose, courts generally find that it does not qualify as a vessel under the Jones Act. *See Cain v. Transocean Offshore USA, Inc.*, 518 F.3d 295, 299 (5th Cir. 2008) (rig was not considered a vessel even though it was capable of self-propulsion because it lacked equipment necessary to make it fully operational as a gas and oil drilling rig and had not been certified as operational by the Coast Guard and therefore it did not qualify as an "instrument of commerce"). Courts have denied Jones Act protection to persons working as construction hands or engineers on a structure or craft that is under

construction or being converted from one type to another.  *See Williams*, 452 F.2d at 958.  The determination of whether a structure's construction or conversion has been sufficiently completed so that it can be considered a vessel is based on when its intended purpose as a vessel begins.  *Id.*  Injuries that occur before then are not covered by the Jones Act.  *Id.*

In *Blanchard v. Engine & Gas Compressor Servs., Inc.*, 575 F.2d 1140, 1142–43 (5th Cir. 1978),  the Fifth Circuit considered a structure formerly classified as a vessel under the Jones Act but undergoing a transformation.  *Blanchard* involved buildings mounted on sunken barges that the owners did not intend to move on a regular basis.  *See Blanchard*, 575 F.2d at 1141–42.  Because the sunken barges were deemed to be "virtually permanent," the Fifth Circuit found them to be more like fixed structures than like "vessels in navigation."  *Id.* at 1141.  In *Fields v. Pool Offshore Inc.*, 182 F.3d 353 (5th Cir. 1999), the Fifth Circuit examined the function of a buoy-like structure with an extensive mooring system, designed to exploit oil reserves in deep ocean waters.  The court found the structure to be unlike a rig in that it was designed to exploit ocean reserves in a particular location for a period estimated at 15 years, not to discover and open a field and then move on to a new location.  *Id.* at 358.  The court concluded that the intended purpose of remaining in a particular location made the structure more like a work platform than a rig.  *Id.*

These authorities determine whether, when Case was injured, the Rowan Midland was a vessel in navigation.   If, when Case was injured, the Rowan Midland was still a semisubmersible drilling rig, under the case law, it could appropriately be classified as a

Jones Act vessel. If the Rowan Midland was a floating production unit or in conversion to its intended use as a production unit, it is not a vessel in navigation under the Jones Act.

The record shows that the Rowan Midland was originally constructed to be a mobile offshore drilling rig but at the time of Case's accident was being converted to a semisubmersible floating production facility. The charterer and prospective owner, ATP, intended to use the Rowan Midland as a production facility.

The Rowan Midland was moored to the ocean floor at the time of Case's accident. The Rowan Midland had been towed to Block 711 of the Mississippi Canyon, where it was fixed to the seabed through a mooring system with embedded plate anchors. The moorings have a design life of 10 years. Once moored, the Rowan Midland underwent final outfitting. The record shows that the Rowan Midland is to be fixed to its location not merely to open the field, but to exploit it fully. There are no plans to move the structure so long as the hydrocarbons remain economically productive. This long-term commitment to a specific location supports the inference that the Rowan Midland is more like a work platform than a semisubmersible drilling rig. *See Hemba,* 811 F.2d at 277–78 (finding rig structure attached to gulf bottom by pilings driven into ocean floor and moved only twice in twenty years not to be a vessel). While the structure was capable of movement and could potentially be moved in the future, such movement was not a part of its primary purpose as a production facility intended to be fixed in one for an extended indefinite period. *See Bernard*, 741 F.2d at 831–32.

14

The Rowan Midland is not a vessel under the Jones Act merely because it was formerly used as a semisubmersible oil rig. The Rowan Midland's self-propelling capability is incidental to its intended use as a production platform. While it is possible that the structure could be relocated at a later date, this relocation is speculative and not within the owners' intended use.

Based on the record, the Rowan Midland meets two of the three factors the Fifth Circuit has identified in classifying a structure as a work platform and not a Jones Act vessel. *See Fields*, 182 F.3d at 357–58. Its primary intended use is as a production facility, not a work platform. The intended purpose of the structure is the relevant inquiry. *See Johnson v. Odeco Oil and Gas Co.*, 864 F.2d 40, 43 (5th Cir. 1989) (finding oil production platform was not a vessel in large part due to owners' intent to leave structure permanently fixed to ocean floor). The mooring of the Rowan Midland combined with the owners' intended use makes it inappropriate to classify it as a vessel. *See id.* at 43. This result is supported by the fact that the construction work for the conversion of the Rowan Midland was not yet completed at the time of Case's injury. *See Cain*, 518 F.3d at 298–99.

Because the Rowan Midland is not a vessel, Case's claim fails to meet the requirements of a Jones Act claim.

## B.    Did Case's Work Qualify Him as a Jones Act Seaman?

Case's Jones Act claims also fail because his duties did not qualify him as a seaman. For a claimant to be a seaman, his duties must contribute to the function of the vessel or the

accomplishment of the vessel's mission and he must have a connection to the vessel in navigation that is substantial in both duration and nature.  *See Chandris*, 515 U.S. at 371; *McDermott*, 498 U.S. at 337.  This two-prong test serves to distinguish "sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation."  *In Re Endeavor Marine Inc.*, 234 F.3d 287, 290 (5th Cir. 2000) (quoting *Chandris*, 515 U.S. at 368).

To satisfy the first prong,  a claimant need only show that he "do[es] the ship's work." *See Chandris*, 515 U.S. at 369.  This threshold showing is broad, extending to all who work at sea in the ship's service.  *Id.* (citing *McDermott*, 498 U.S. at 354).  The second prong does not look to the  employee's particular job as determinative but to "the employee's connection to a vessel."  *McDermott*, 498 U.S. at 354.  A seaman must have an employment-related connection to a vessel in navigation, and the connection must be substantial in both duration and nature.  *See Chandris*, 515 U.S. at 371.  The Supreme Court has accepted as a guidepost the Fifth Circuit's test that "a worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." *Id.*

The Supreme Court did not limit the seaman status inquiry "exclusively to an examination of the overall course of a worker's service with a particular employer," noting that "[w]hen a maritime worker's basic assignment changes, his seaman status may change as well."  *Chandris*, 515 U.S. at 371–72 (citing *Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d

1067, 1077 (5th Cir. 1986)).  The test is not so stringent as to deny Jones Act coverage to someone who is injured shortly after receiving a new assignment.  Rather, "the assessment of the substantiality of his vessel-related work [should be] made on the basis of his activities in his new position."  *Id.* at 372.

The duration and nature of the seaman's employment is not a "snapshot" test limited to the moment of injury.  *See Chandris*, 515 U.S. at 363.  For example, an employee injured while working on land may still have seaman status if his employment established a substantial connection to a vessel in navigation that consumed more than 30% of his time. *See Hebert v. Weeks Marine, Inc*., 251 Fed. Appx. 305, 307 (5th Cir. 2007).  An employee dividing time between onshore and offshore work may not claim seaman status unless his offshore work is substantial in both nature and duration.  *See Nunez v. B&B Dredging, Inc.*, 288 F.3d 271, 275–76 (5th Cir. 2002).  A seaman must show that he "performed a significant part of his work aboard the ship with at least some degree of regularity and continuity." *Holland v. Allied Structural Steel Co.*, 539 F.2d 476, 484 (5th Cir. 1976) (citations omitted).

Case contends that his work as a rigger contributed to the accomplishment of the Rowan Midland's mission and that his connection to the Rowan Midland was substantial. (Docket Entry No. 13).  Case points to the fact that he was required to sleep on the structure as evidence that he was a sea-based rather than a land-based employee.  (Docket Entry No. 13 at 4).  Even if Case's work as a rigger on the Rowan Midland required overnight stays, that is not enough to establish a substantial connection.  *See Ardoin v. J. Ray McDermott Co*.,

641 F.2d 277, 282 (5th Cir. 1981) ("[M]erely sleeping and eating aboard a support vessel while working on a fixed platform does not make one a seaman if one does not otherwise meet the [Jones Act] criteria."; *Keener v. Transworld Drilling Co.*, 468 F.2d 729, 731 (5th Cir. 1972) (finding that the term "seaman" or "member of the crew" is "used primarily to distinguish maritime workers whose presence aboard ship is transitory from those with a more permanent attachment to the vessel" and noting that "[s]tevedores and offshore roughnecks who do no more than sleep and eat aboard a [ship] fall into the former category").

When Case was injured, he did not have any significant previous experience working aboard a vessel.  (Docket Entry No. 15 at 3).  After recovering from his injury, he was assigned to work on the Rowan Midland on three separate occasions, for a total of 185 hours.  (*Id.* at 7).  This work amounted to 10.52% of his total work hours.  (*Id.* at 7-8).  This percentage of work is far below the 30% guideline set by the Fifth Circuit and endorsed by the Supreme Court.  *See Chandris*, 515 U.S. at 371.  The bulk of Case's work for Omega was performed either at Omega's yard in New Iberia, Louisiana as a driver or as a rigger aboard fixed platforms, unconnected to the Rowan Midland or a vessel.  (Docket Entry No. 15, Attachment 3 at 4).

Even if the Rowan Midland qualified as a vessel, Case's connection with the structure is lacking in both duration and nature necessary to qualify him as a Jones Act seaman.

**IV.    Is There Federal Question Jurisdiction Under the Outer Continental Shelf Lands Act?**

Although Case does not qualify as a seaman and cannot assert claims under the Jones Act, the defendants must still show that this court has federal subject-matter jurisdiction under 28 U.S.C. § 1441.  The absence of a Jones Act claim does not create federal removal jurisdiction.  *See Hufnagel v. Omega Servs. Indus. Inc.*, 182 F.3d 340, 348 (5th Cir. 1999). The defendants rely on the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1333, 1349(b)(1), as the basis for federal jurisdiction.  Case seeks remand on the basis that he did not assert a federal claim under or refer to the OCSLA in his petition or other pleading.

**A.    The Applicable Law**

The OCSLA states:

> [T]he district courts of the United States shall have jurisdiction of cases and controversies arising out of or in connection with
>
> (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals . . .

43 U.S.C. § 1349(b)(1)(A).

The OCSLA provides nonexclusive federal subject-matter jurisdiction over cases and controversies "arising out of or in connection with" any operation involving the "development" of minerals on the Outer Continental Shelf.  43 U.S.C. § 1349(b)(1)(A).

"Development" is defined as "those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered."  43 U.S.C. § 1331.  In *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202 (5th Cir. 1988), the Fifth Circuit stated that the term "operation" in section 1349 of the OCSLA referred to physical acts undertaken on the Outer Continental Shelf.  *See Amoco*, 844 F.2d at 1207.

Federal removal jurisdiction under the OCSLA requires the plaintiff to assert a claim that falls within the OCSLA.  *See Tenn. Gas Pipeline Co. v. Houston Cas. Co.*, 881 F. Supp. 245, 248 (W.D. La. 1995).  Because Case's claim arises out of an operation on the Outer Continental Shelf involving mineral production, he could have asserted a cause of action under the OCSLA.  The defendants cannot base removal on an unasserted federal claim.  *See Coody v. Exxon Corp.*, 630 F. Supp. 202, 204 (M.D. La. 1986) (citing *Pan Am. Petroleum Corp. v. Super. Ct. of Del.*, 366 U.S. 656, 662 (1961)).  The fact that a plaintiff does not plead the OCSLA in a state-court petition does not always bar removal.  Claims asserted in state court can provide a basis for removal if they are necessarily federal in nature.  *See Gilbreath v. Guadalupe Hosp. Found.*, 5 F.3d 785, 790 (5th Cir. 1993) (quoting *Brown v. Sw. Bell Tel. Co.*, 901 F.2d 1250, 1254 (5th Cir. 1990)).  A court must determine whether the plaintiff's claim concerns issues "intended by Congress to be within the jurisdictional scope of the OCSLA and the federal courts."  *See Tenn. Gas*, 881 F. Supp. at 249.

The Fifth Circuit applies a "but for" test to determine whether a plaintiff's claim is essentially federal so as to fall under the OCSLA's federal subject-matter jurisdiction.  In *Hufnagel*, 182 F.3d at 350, the court held that because the plaintiff's injuries occurred on a stationary drilling platform on the Outer Continental Shelf during his employment in the "exploration, development, or production" of minerals on the shelf, removal was proper despite the fact that he did not plead a claim under the OCSLA.  If a plaintiff's injury occurs on the Outer Continental Shelf in furtherance of mineral development and such an injury would not have occurred but for the plaintiff's employment, the claim falls under the OCSLA.  *See EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569–70 (5th Cir. 1994); *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988); *Tenn. Gas*, 881 F. Supp. at 569.  The OCSLA incorporates state law as federal law.  *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 549–50 (5th Cir. 2002).  Section 1333(a)(2) of the OCSLA states that "[t]o the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws . . . the civil and criminal laws of each adjacent State . . . are hereby declared to be the law of the United States [on Outer Continental Shelf situses as defined by section 1333(a)(1) ]."  43 U.S.C. § 1333(a)(2)(A).  State law fills in gaps in federal law and serves as surrogate federal law.  *Diamond Offshore*, 302 F.3d at 549; *see also Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 480 (1981); *Hufnagel*, 182 F.3d at 348 (holding that the OCSLA governed in part due to plaintiff's mention of the state Civil Code); *Broussard v. John E. Graham & Sons*, 798 F. Supp. 370, 373–74 (M.D. La. 1992) (inferring

claim under the OCSLA when plaintiff sought relief under the "Laws of Louisiana" due to the OCSLA's incorporation principle).

A claim that alleges a maritime tort cannot be removed. *See Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1227–29 (5th Cir. 1985) ("It is apparent that Congress, in passing the OCSLA, made a determination that maritime law, which never before had to deal with the extraction of minerals from the sea bottom, was unsuited to the task and that state law as adopted federal law should control."). The test for deciding whether maritime law governs a tort action is whether the incident has both a "maritime situs and a connection to traditional maritime activity." *See Hufnagel*, 182 F.3d at 351–52. If a claim fails to meet either requirement, maritime law does not apply to preclude removal. *Id.*

The first prong requires the plaintiff to show that the tort either occurred on navigable waters or, if the injury occurred on land, that it was caused by a vessel on navigable waters. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 533–34 (1995). An accident occurring on an offshore drilling platform does not qualify under the situs requirement. *See Hufnagel*, 182 F.3d at 351; *see, e.g.*, *Rodrigue v. Aetna Cas. & Sur. Co.* 395 U.S. 352, 389 (1969) (drilling platforms are not within admiralty jurisdiction). Such a platform is considered an island, "albeit an artificial one, and the accidents [have] no more connection with the ordinary stuff of admiralty than do accidents on piers." *See Rodrigue*, 395 U.S. at 360.

The second prong requires the claim to arise from a traditionally maritime activity. *Jerome B. Grubart*, 513 U.S. at 541.  Activities on stationary or fixed drilling platforms are not related to traditional maritime navigation or commerce and do not meet the "traditionally maritime" requirement.  *See Rodrigue*, 395 U.S. at 364–65; *see also Coody*, 630 F. Supp. at 203–04 (denying removal because plaintiff's pleading fell within maritime law and lacked any mention of state law or the OCSLA).

### B.    Analysis

Like the plaintiff in *Hufnagel,* Case did not mention the OCSLA in his state-court petition.  Case alleged that the accident occurred on the Rowan Midland "when it was set up as a mobile production platform in the Mississippi Canyon, off the coast of Louisiana." (Docket Entry No. 1 at 4).  The alleged accident occurred on a structure  erected on "the subsoil and seabed of the outer Continental Shelf." 43 U.S.C. § 1349(b)(1)(A).  The OCSLA includes "platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing minerals discovered."  43 U.S.C. § 1331.  The facts that Case alleged in his complaint meet the Fifth Circuit's but-for test for federal jurisdiction: the injury occurred on the Outer Continental Shelf, while Case was employed in furtherance of mineral development, and the injury would not have occurred but for Case's employment.  *See Hufnagel*, 182 F.3d at 349; s*ee also Texaco Exploration and Prod., Inc. v. AmClyde Engineered Prods. Co., Inc.*, 448 F.3d 760, 769 (5th Cir. 2006).

Removal is not precluded because Case has alleged a maritime tort.  Neither the maritime situs nor the traditional maritime activity test is satisfied.  The accident did not occur on navigable waters, but rather on the Rowan Midland, which is not a vessel and at the time of the accident was already attached to the Outer Continental Shelf.  Case's claim does not arise out of a traditional maritime activity, but rather out of activities involved in the exploration and development of the Outer Continental Shelf, activities intended to be governed by the OCSLA.  *See Rodrigue*, 395 U.S. at 364–65;  *Texaco Exploration and Prod.*, 448 F.3d at 768.

## V.      Conclusion

The motion to remand is denied.

SIGNED on July 10, 2008, at Houston, Texas.

_____
                  Lee H. Rosenthal
            United States District Judge

24